NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| hip (HEIGHTENED INDEPENDENCE & PROGRESS), INC., et al, | : : : | Civil Action No.  07-2982 (SRC) |
| Plaintiffs, | : : | |
| v. | : : | **OPINION** |
| THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, | : : : : | |
| Defendant. | : : : | |

**CHESLER, U.S.D.J.**

This matter comes before the Court on the motion for summary judgment filed by Plaintiffs hip (Heightened Independence and Progress), Inc. ("hip"), United Spinal Association, and Peter Gimbel (collectively "Plaintiffs") [docket item no. 59].  Defendant opposed the motion and filed a cross-motion for summary judgment [docket item no. 73].  The Court held oral arguments on June 22, 2011.  The Court requested, and the parties provided, supplemental briefing of arguments supported by the record, and, in particular, of the relevance of the Third Circuit's recently decided *Disabled in Action of Pennsylvania. v. Southeastern Pennsylvania Transportation Authority*, 635 F.3d 87 (3d Cir. 2011).  After consideration of the parties' arguments, the Court has determined that it will grant Plaintiffs' motion for summary judgment and deny Defendant's motion for summary judgment.  In the following discussion, the Court

gives its reasons for the decision.

## I.   FACTUAL BACKGROUND

The case arises from a failure to make a Port Authority Trans-Hudson Corp. ("PATH") station accessible in accordance with the Americans with Disabilities Act, 42 U.S.C. § 12133 (the "ADA").  In 2002, the Port Authority began construction to the east end of the Grove Street Station (the "Station").  The entrance in question is at the corner of Luis Munoz Marin Boulevard and Christopher Columbus Drive, at the east end of the Station ("East Entrance").  The construction was undertaken in large part due to the increased ridership at the Station.  The East Entrance was reoponed to the public on May 15, 2005.  The Station is multi-level, with a mezzanine level separating the street from the platform, and has no elevators, ramps or lifts and is therefore inaccessible to wheelchair bound persons.

## II.   DISCUSSION

### A.  Standard of Review

The standard upon which a court must evaluate a summary judgment motion is well-established.  Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. Cnty. of*

*Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of

establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986).  "[W]ith respect to an issue on which the nonmoving party bears the

burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is,

pointing out to the district court – that there is an absence of evidence to support the nonmoving

party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has properly supported its showing of no triable issue of fact and

of an entitlement to judgment as a matter of law, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The party opposing the motion for

summary judgment cannot rest on mere allegations and instead must present actual evidence that

creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *see also*

Fed.R.Civ.P. 56(c) (setting forth types of evidence on which nonmoving party must rely to

support its assertion that genuine issues of material fact exist).  "[U]nsupported allegations . . .

and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*,

912 F.2d 654, 657 (3d Cir. 1990).  "A nonmoving party has created a genuine issue of material

fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v.*

*Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).  If the nonmoving party has failed "to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue

of material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. &*

*Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

**B.  Title II of the ADA and its Implementing Regulations**

Title II of the ADA prohibits discrimination in the provision of public services.  Section 202 of the ADA, 42 U.S.C. § 12132, provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, activities of a public entity or be subjected to discrimination by any such entity.

The ADA required the United States Department of Transportation ("DOT") to promulgate regulations implementing the provisions of the ADA that relate to public transportation in a manner consistent with the Architectural and Transportation Barriers Compliance Board (also known as the "ADA Accessibility Guidelines," or "ADAAG"). *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 655 F. Supp. 2d 553, 558-59 (E.D. Pa. 2009). DOT's implementing regulations state that a "transportation facility is readily accessible if it complies with the DOT's regulations and with ADAAG." *Id.* (citing 49 C.F.R. § 37.9).  DOT's implementing regulations recognize three types of construction which trigger a public entity's obligation to make a facility accessible to persons with disabilities: new construction, additions and alterations.  49 C.F.R. §§ 37.41 and 37.43.

In order to proceed in its analysis, the Court must determine whether the East Entrance constitutes new construction, an addition, or an alteration.  The ADA defines an alteration as:

> a change to an existing facility, including, but not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-heigh partitions.

4

49 C.F.R. § 37.3.  While the parties expend much energy debating whether the East Entrance[1] is new or simply a reopened entrance, Defendant ultimately concedes that the construction may be classified as an alteration.  The Court will assume for purposes of this opinion, that the subject construction is, at a minimum, an alteration under the ADA Accessibility Guidelines, although it may also qualify as new construction and/or and addition.[2]

Once construction is deemed an alteration, it triggers the obligation for the entity to make its facility accessible "to the maximum extent feasible."[3]  The exception to this directive is where making the facility accessible is "technically infeasible."  ADAAG § 4.1.6(1)(j).  "Technically infeasible" means that the accommodation:

> has little likelihood of being accomplished because existing structural conditions would require removing or altering a load-bearing member which is an essential part of the structural frame; or because other existing elements, spaces, or features which are in full and strict compliance with the minimum requirements for new construction and which are necessary to provide accessibility.

*Id.*

### C.  Proposed Alterations for Accessibility through the East Entrance

Defendant prepared a report titled "Grove Street Station ADA Access and Capacity Enhancements: Northeast Entrance" dated March 30, 2011 ("Northeast Entrance Report").

---

[1]This Court will only address issues pertaining to the East side of the Station.  Though Plaintiffs make arguments pertaining to the West side construction, they do not plead allegations relating to the West side in their Complaint.  The Court makes no comment regarding potential amendment of the Complaint to include allegations relating to the West side.

[2]Defendant's obligations to ensure accessibility are heightened under the ADAAG when new construction or additions are involved.

[3]The entity shall make the alterations (or ensure that alterations are made) in such a manner, to the maximum extent feasible, that the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.  49 C.F.R. § 37.43 (a)(1).

(Supp. Stulberg Dec. Ex. B).  The report identifies six possible schemes for bringing the Station

into compliance with the ADA.  Plaintiffs only discuss the first five, and the Court will therefore

limit its analysis accordingly.  It bears mentioning that Defendant admitted that installing an

elevator from street level to the mezzanine would have required no structural modification.

(Supp. Stulberg Dec. Ex. A at 15).  What remains, therefore, is to ascertain whether access at the

street level entrance and from the mezzanine to the platform is feasible.  There is a contested

issue of material fact as to the feasibility of schemes 1, 2, and 3.  However, the Court finds that

both scheme 4 and scheme 5 are feasible.  Defendant fails to even suggest that either scheme

would "require removing or altering a load-bearing member," let alone one that "is an essential

part of the structural frame."  ADAAG § 4.1.6(1)(j).  Both schemes 4 and 5 propose enhancing

access from the sidewalk to the entrance by adding a 3'6" wide concrete ramp with intermediate

platform.  Plaintiffs do not take issue with this alteration and Defendant never contends it is not

feasible.

      Schemes 4 and 5 are plans to install a Limited Use Limited Application (LULA) elevator.

Defendant's papers do not address each scheme in turn, however, Defendant does claim that

"installing an elevator on the east end of the station from the mezzanine to the platform would

require an expansion of the mezzanine outside of the existing footprint and would reduce the

width of the ingress/egress corridor below NFPA standards."  (Def.'s Supp. Br. at 5).  In support

of this statement Defendant cites paragraphs 4-7 of the affidavit of Rhonda Kearse.  Paragraph 4

is the only paragraph in that range that addresses the east side; it states: "[p]age 13 of the

Northeast Entrance Report shows that in order to safely install an elevator on the East End of the

Station from the mezzanine to the platform without removing the existing stairway, it will be

necessary to expand the East mezzanine level." (Kearse Aff. ¶ 4). Page 13 of the report deals with scheme 3 which is an ADA elevator as opposed to a LULA.

While Defendant dose not parse its objections scheme by scheme, Defendant does blankly assert that, "any modifications that safely provide access to the Station within the meaning of the [ADA] require acquisition of third-party property." (Def.'s Supp. Br. at 1). Defendant goes on to state: "[a]lthough there is some debate about whether an incline elevator[4] could be installed at the Station without the acquisition of property, even if it were possible, such an installation would hinder the Station's ingress and egress capability and potentially violate National Fire Protection Association ("NFPA") standards." (*Id.*). At best, Defendant has identified two potential grounds for technical infeasibility: (1) narrowing corridors; and (2) property acquisition.

### 1. Ingress and Egress

Under NFPA 130 Standard for Fixed Guideway Transit and Passenger Rail Systems a bi-directional corridor must be at least 44 inches wide to ensure safe ingress and egress. With regard to scheme 4, the stairway that would be situated to the right of the elevator is 4 feet 2 inches wide. (Supp. Stulberg Dec. Ex. F at 56). The corridor that would be at the bottom of the staircase that runs along the north edge of the elevator is also 4 feet 2 inches wide, well over 44 inches. (*Id.* at 57). As for scheme 5, the corridor created by the addition of the elevator is 4 feet 4 inches wide, also in excess of the 44 inch requirement. (*Id.* at 59). As such, neither scheme runs afoul of NFPA 130, and Defendant has not shown that they are technically infeasible on

---

[4]The Court assumes for purposes of this opinion, though it is never made explicit, that Defendant uses the term "incline elevator" synonymously with LULA, which would therefore cover schemes 4 and 5.

these grounds.

### 2. Third-Party Property Acquisition

Based on the parties' submissions, it seems possible that Defendant may have to acquire property from Jersey City.  The Northeast Entrance Report indicates that the elevator shaft construction in both schemes 4 and 5 would "require structural modifications and excavation from [the] street above."  (Northeast Entrance Report at 14, 15).  Assuming that such excavation would require acquiring property from Jersey City, this still does not amount to technical infeasibility.  Not only has the Mayor provided assurances that "Jersey City is committed to take the immediate action necessary to provide the easements or sale of the property to the Port Authority" (July 8, 2011 Second Dec. of James Weisman at Ex. A), but the position of the City has no bearing on the technical feasibility of this project.

In *Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority*, 635 F.3d 87 (3d Cir. 2011) ("*SEPTA*"), the Third Circuit found that SEPTA's need to acquire property from the city was not grounds to undermine the relief requested -- making the station accessible -- nor did it require joinder of the city.  *Id.* at 97-98.  Defendant attempts to distinguish the instant case by saying that Jersey City has never been a party to the action nor does it have an ownership interest in any part of the existing station.  In *SEPTA*, Philadelphia was no longer a party to the case at the time the Court rendered its decision.  Moreover, at no point does the *SEPTA* court indicate that Philadelphia's ownership interest in the property in question is at all dispositive.  In fact, the *SEPTA* court recognizes that the city's cooperation would be necessary to carry out its order and states, that as in the present case, "[defendant] will have to work with the City in complying with our decision . . . ."  *Id.* at 98.  In light of the Third Circuit's opinion in *SEPTA* this Court can find no reason why the acquisition of property from Jersey City,

particularly where the City has already indicated its willingness to cooperate, should constitute technical infeasibility.

Finally, the Court notes that Defendant acquired property in connection with the 2002 to 2005 construction of the East Entrance. (Supp. Stulberg Dec. Ex. D [7/13/11 Dep. of Port Authority Principal Property Specialist Pal Gembara at 9, 11-12, 15-16, 18-22]). It would be contrary to the spirit and the letter of the ADA to permit Defendant to avoid its obligation to make the Station accessible for the disabled based on the need to obtain property rights, when the very same need did not prevent Defendant from making the alterations that triggered the obligation in the first place.

III.   CONCLUSION

Because this Court finds that schemes 4 and 5 of the Northeast Entrance Report are technically feasible, this Court will grant Plaintiffs' motion for summary judgment and deny Defendant's motion for summary judgment. The Court notes that the original impetus for this construction, increased ridership on the PATH system, is all the more reason to accommodate disabled and able-bodied persons alike. An appropriate form of order will be filed together with this Opinion.

  s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

DATED: September 6, 2011